In 2009, she was again hospitalized. Right after admission, she was released. She was again hospitalized and she was placed in a court-ordered treatment. In 2010, she was again hospitalized. In 2010, the hospitalizations were all in all from bipolar disorder or depression. The administrative director said to his folks, he was jumping from career to career. For reasons I don't want to discuss today, he did not support any of these amendments. He was trying to work. He was trying to serve his people. He was trying to serve all of his people. He was trying to serve his people. To show her that he didn't take those kinds of recommendations, the kind of recommendations that he gave 2001 and 2010, he tried to separate himself between 24 judgments. Each one was short-term, except for the one that he had to try out for one year. But this is his result. His mom was disgusted by her appearance. She tried for him to school, but he couldn't complete it. There's no inconsideration. There's no inconsideration. We have time for a couple of questions. I would like to interject a question. I think that the ALJ may need to make a preliminary determination. So, I would appreciate it if at some point, in your argument, you address why you think that determination is in support of this judgment. I was going to point out that most positions give prior determination to consistently disability. As for application, I just want to let you answer your question first. The Administrative Order, as I said after the first question, it turns out, wasn't getting in across the barricade, which is just not supported by ALJ. The Administrative Order said she lacked motivation, which isn't substantiated by ALJ. The Administrative Order said that she missed appointments. She was non-compliant. She had a GAF of 55. Look at the thresholds. The thresholds for non-compliance, if you look at this record, she's an African-American. She's taking her medication. She's getting the treatment. She does miss some appointments, but she's on court orders here. She's on court orders because she wanted a judgment to teach her a lesson. The court is monitoring this to make sure she goes. It's not a question of if she's patient or if she's not patient. It's a question of if the individual was as honest to it and who should have a response for a symptom that's related to her impairment. With respect to the GAF of 55, elsewhere in this section of the Administrative Order, it notes that the administration doesn't find a GAF of 55 to be the equivalent of a student who repeated work. It has nothing to do with her disability. Yet, she turns around and he says it, and I'm going to point out two very, very important things. First of all, we have the memorandum from the Commissioner for Social Security that says that the Psychological Association or the SUD is not entitled to a GAF rating. It's just a clause. It does not encourage a student to measure the work done, etc., etc. We have to see how she's going to deal in the face of hardships. She will operate as part of all of them. She's at home doing what she can on her own schedule. She doesn't need to be in a certain place at 830. She doesn't have to stay in a certain place all the time. She doesn't have to respond to criticism of supervisors or co-workers or a time of trouble. It's a very different situation. It is a GAF rating. It's a GAF rating also. There's two reasons. The first is that it's not a serious issue. It's a study because she was told or interviewed or talked about that there's other issues that she should be concerned about. The second reason is that it's not a serious issue. It's a GAF rating. It's a GAF rating. She goes to her supervisors. Both me and the GAF and the other supervisors and GAFs. She has counseling with her. She does an education with her. And she explains. She doesn't go to the counselor. She doesn't want to talk to other people. She doesn't want to get in the way of strangers. And the environment that she's in is sufficient for her particular needs. But the counseling, there's no evidence against her. We don't see anything on the outside. And so, there's just no evidence. It's just the fact that it's not a GAF rating. At most, you can say that it's worse than that. But that's the reason that it's pretty much a study. And the court ordered her to return to New York. And this is a lady who's in her time. It's a very, very difficult time. And the judge calls her back early in the morning. But what happens after this is she gets back. And she tries to ignore everything. She needs to see what's going on. So, it's just kind of an open wound. You look at the picture, and it's just an elevation of distress. Can you see my notes? Yeah, it looks like that. That's the end of the court order. That's the end of the court order. Thank you. Thank you. Okay. So, we're not done. We're going to move to session. And I just want to close by thanking everyone else who came out. We're going to take a break. And we'll get back to you in a couple of minutes. And we're going to take a short break. And we'll be back in a couple of minutes. All right. Thank you. Thank you. Thank you very much. With respect to the medical source of abuse, first I'm going to talk about what we mean by the training resource. As you can see, there's a statement on this slide, and it's very important to understand what's going on. We look at records of abuse. There's a change in status. There's a change in cost. There's a change in the amount of money. We all know that. There's a huge difference between a nurse practitioner and a patient. We see a difference in the cost of medicine. We see a difference in the cost of treatment. We see a difference in the amount of money. So, we're going to show you a bunch of things that we have on the floor. One of the key standards for doing this is that we must rely on the opinions of specialists who are going to manage the resource. And we need to have an on-the-job management team. And that will be essential for the medical source. The patient's role is to show it. We have a post-patient management authority. We have a policy authority. We have a dispatcher himself, Section 204. One of the things I want to make is, first of all, it's the person who arrives to receive our Section 204 on the basis of his or her status. When you're a nurse, you're producing patients that are in their 20s and 30s. But what you're producing a patient that's 25, that's 30, that's 45, that's 50, it's not a trusted patient. So, it's called a bad patient. In other words, a patient that's getting out of their 20s. You produce a patient that's inconsistent with each of these occupational or industrial standards. But, how do you solve this? Well, it's assuming that you're not the patient. It's assuming that you're not the person. You know who I am. But it's assuming that you're not the patient. What we're saying is, you know who I am. So, the patient is the nurse.  We're all the same. But the conclusion is the same. We're all similar. It's just that we are all different. There's no difference. We're all different. We're all different. We're all different. But, the key to us is a pretty good test of logic. Especially, if you meet that kind of a set of standards. And, that's what I'm assuming is the case. And, it seems like that is a pretty good standard. I'm going to go ahead and end the presentation. Okay. Is there other speakers? Thank you. Sorry for the hold. It's more the condition. Thank you. Mr. Sleby is in a pretty dire picture. His work is dysfunctional. I want to submit that a real in-depth look at the background of this case is not the court. Mr. Sleby has conditioned that this woman is in jail, and she seems to be the breaker's choice, perhaps. In the end of 2010, she had a little bit of period of exacerbation that required some hospitalization and some more intensive treatments. Marker says that this seems to have been a result of a reduction in her medications. The task force to which Mr. Sleby refers to are contained during that period of exacerbation. But once she gets stabilized by her medication, there is a long period of stability. And I would like to sum up what Marker just said. I'm getting notes from the TV nurse practitioner, Mrs. McLaughlin, who was introduced to me a little bit earlier in the year. I'm not sure if that's why I'm speaking to you, but it seems to me that I've been dealing with her for 15 years, and it's a really good message for me to get some help. I'm not sure if that's why I'm speaking to you, but it seems to me that I've been dealing with her for 15 years, and it's a really good message for me to get some help. I'm not sure if that's why I'm speaking to you, but it seems to me that I've been dealing with her for 15 years, I'm not sure if that's why I'm speaking to you,  and it seems to me that I've been dealing with her for 15 years. She's completely inconsistent with her behavior, which I mentioned to you earlier today. She talked about Ms. McLaughlin's student notes, showing that she was unstable. She ended up showing normal mental status examination findings. She ended up showing Ms. Robertson's home statement that she was in a clutch. Well, she had a desire to go to a place where she had to go to school, to go to work. And she said that she was participating in, and these are reasons, very good reasons, but it is a reason that she could have been in a place where she would have been able to survive, like the hospitalizations, certain hospitalizations for, you know, the conditions that she was in. So it's a pretty significant disability. Her self-estimation is not correct. So that's why, yes, I do feel that she had a case involving self-restraining disability on the basis of mental disorders. So that's why it seems to me that Ms. McLaughlin was involuntarily responsible for judging Ms. McLaughlin. I guess I don't have a hard time seeing why, you know, maybe her submission is not as accurate as what she was looking for. There's no question that she has her condition. She doesn't need her condition. The question is how much of a factor where she is uncompliant with her treatment versus how much of it is her medication, where she starts taking her meds again, is where she had her condition. I saw some stray references to marijuana. Yes. I mean, that's not a cause for a problem. Well, during the hospitalization in December of 2012, there were lots of labels and characters for marijuana and pesticides. So I think that it's pretty clear that she was an easy choice at that time because of her conditions and health conditions. And we're not going to do anything about it. We're not going to do anything about it. It's just something that we're referring to. Right. I think the record is pretty clear. Michelle, how did you train her to persist? Well, the first time in 2007, I'll meet you, the doctors, and see if anything helps. And she did not. Her first intervention was not taking medications she was supposed to take. And as you noted in the video earlier in December of 2010, she's using physical drugs. And so I think there's very clear correlations between her health and her circumstances. And then if you look at the record, it's a very clean period of time, so not limited in terms of exacerbation to a smaller period of exposure to a smaller medication and compliance to it. And so I think that it's able to fairly drew a conclusion from that health status in that record that she was not as limited as she claimed to be during those periods of time. Mike, as I've just noted, I think there's a question for you that I asked your anniversary. And that is this. She obviously has a clinical condition that's a result of her use. She has four sessions. The credibility question in my mind, and I might be missing something, is whether she's put together suspicions of the intensity of stroke or the limiting effects of her illness. I think you can't say very much on that. So what's your argument as to why you're suggesting confidence, suppose, in the credibility to such an essential position? Or to you, would you agree with her on all of the things that she's been told to have to be safe, emerge, during that different position? I don't agree with my understanding of her position as a clinician, for now. But I would say that she's been given, for several reasons, supported by substantial evidence for planning, service, and others. For instance, she stopped working in 2009 because she was sick of being sick of the economy, not because of her mental impairments. We've discussed this before, that she does not complain. She did not show up many times for appointments. She's a stroke companion, and I would strongly recommend that she consult. I'm just thinking, though, in 2011, we just wrote this in, and did counseling, and returned home only, I think, two times. She's treated for some other things in the emergency room, and at those times, there were no findings that there was any problem with her mentality. So, this non-compliance with treatment is definitely a factor that has transferred some types of complaints. Danielle, she noted, she had poor motivation to work, and I think that there were several times in her life that her services faded, and she took a few weeks to see what had happened, what her symptoms had been, before she even had the chance to go out there and try to find a job. The other thing that Danielle, she noticed was her daily activities, and these weren't activities that were so simple, because she, in terms of her home grooming and just limited chores, she actually went to school. She used computers to pay her bills. She made jewelry. She visited with others. She went to movies and out to eat. She was very active socially. She went to ball games. She went to movies. She went to go fishing. She took care of her father. These are not activities that you would normally see somebody who's so limited be able to perform. So, these reasons that eventually drew her funding, and she was not comfortable, is really supported by substantial health and well-being experiences. Thank you. What about the state of Arizona's distribution of care? The state of Arizona has a program called the Serious Commitment to Care program. It has no bearing on disability, such as a person to court. It is a program that calls assisted people with mental illness to get services, to get treatment and help them be, but actually it has nothing to do with what a person can and can't do. So, it's a very strict, very limited assessment to the assumption that she's disabled for social security purposes. We're almost out of time. So, if there are any further questions, we would usually ask that this case be affirmed by this board. Thank you. Thank you.
judges: Gould, Clifton, Watford